STATE EX REL. SACKETT, RELATRIX, *v.* THOMAS,
DEFENDANT.

(No. 1,669.)

(Submitted April 1, 1901.   Decided April 8, 1901.)

*Constitution—Local or Special Laws—Changing the Names of Counties—Mandamus.*

1. Constitution, Art. V, Sec. 26, prohibiting the legislature to pass local or special laws changing the name of persons or "places" applies to changing the names of counties, notwithstanding Article VI, Sec. 4, and Article XVI, Secs. 1, 3, recognize the power of the legislature to create new counties and to change those already established.
2. Under the Constitution the legislature has the power to create counties and give them names, or destroy them, but after they are created they may not be disturbed by special or local legislation, except incidentally in the exercise of the creative power, or in cases where a general law cannot be made applicable.
3. The word "persons" used in the Constitution, Art. V, Sec. 26, embraces all persons, whether natural or artificial.
4. Under Code of Civil Procedure, Secs. 150, 152, requiring a district court to have a seal, and prescribing its form and the words to be inscribed on it; and Section 1210, permitting the party in whose favor a judgment is given to have a writ of execution for its enforcement, on demand, at any time within six years after entry, which writ is required, by Section 1211, to be issued in the name of the state, sealed with the seal of the court, and subscribed by the clerk, etc.,—a writ of mandate to compel the clerk to issue an execution with the seal, bearing the former name of a county, is the proper remedy, where the legislature, by a void act, has attempted to change the name of a county.

APPLICATION for writ of mandate by the state, on the relation of Mrs. M. A. Sackett, against the clerk of the district court of the Third judicial district for Deer Lodge county. Writ granted.

*Mr. C. E. Sackett* and *Mr. W. H. Trippet,* for Relatrix.

*Mr. James Donovan, Attorney General,* for Defendant.

Senate Bill No. 84 changes the name of Deer Lodge County to Daly County.

The first proposition involves the interpretation of the word "places," and the construction to be placed upon the clause of the constitution when considered in its application to Senate Bill No. 84.

The rules of construction and interpretation of constitutions in statutes are well settled, and it is only necessary to apply them to the particular case under consideration.

1. It is a cardinal rule in the interpretation of constitutions that words are presumed to have been employed in their natural and ordinary meaning. (Am. & Eng. Enc. Law, Vol. 6, p. 924; *Miller* v. *Dunn*, 72 Cal. 462; *Sprague* v. *Norway*, 31 Cal. 173; *Matter of McGuire*, 57 Cal. 605; *Weill* v. *Canfield*, 54 Cal. 111; *Oakland Paving Co.* v. *Wilton*, 69 Cal. 493.) Every word employed in the constitution is to be expounded in its plain, obvious, common sense meaning, unless the text furnishes some ground to control, qualify or enlarge it. (Story, Const. Sec. 451.) A constitution is not interpreted by technical rules of art which the law gives, to ascertain its meaning, but it is to be studied in the light of ordinary language, the circumstances attending its formation and the construction placed upon it, by the people whose bond it is. (*Cronise* v. *Cronise*, 54 Pa. St. 255.) "A special act of the assembly which changes the name of a poor district, is not within the prohibition of the constitution against the changing of names of persons or places." (Gen. Dig. 1900, p. 4158, Sec. 15 (f).) The above is from a Pennsylvania case, reported in 5 Lackawanna Legal News, 332. Even where a word having a technical as well as a popular meaning is used in the constitution, the courts will generally accord to it its popular signification, unless the very nature of the subject indicates, or the text suggests, that it is used in its technical sense. (Am. & Eng. Enc. Law, Vol. 6, p. 925, and cases cited.) A constitution is not to be interpreted according to the words used in particular classes, but with a view to ascertain the sense in which the words were employed; and its terms must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the

framers, and by the people who adopted it. (*Manley* v. *State,* 7 Md. 135; *Bandley* v. *Isaac,* 13 Md. 202.)

2. "To arrive at the meaning of the constitution, as of any other writing, the whole of it must be examined. If there is apparent conflict it is the duty of the court to harmonize them, if it can be reasonably done, so as to give effect to every portion of the instrument." (*Matter of Maguire,* 57 Cal. 604, 607.) If words happen to be dubious, their meaning may be established by comparing them with the context, or by comparing them with other words and sentences in the same instrument. (Story, Const. Sec. 400.) "In addition to construing the independent technical and popular meanings of a word used in an act or constitution, we may look to other sections of the same instrument for the sense in which the word is used, as an aid to determine whether it has been used in its popular sense in the particular provision under consideration." (*Miller* v. *Dunn,* 72 Cal. 462; *People* v. *Eddy,* 43 Cal. 331.)

3. Every presumption is in favor of the constitutionality of a legislative enactment, and the judicial department will be justified in pronouncing it unconstitutional only when it becomes a manifest usurpation of power. (Am. & Eng. Enc. Law, Vol. 6, p. —.) The power of the judiciary to declare a statute unconstitutional should never be exerted except where the conflict between it and the constitution is palpable and incapable of reconciliation. (*Stockton, etc. R. R. Co.* v. *City of Stockton,* 41 Cal. 147.) The unconstitutionality of a statute must be clear and manifest before a court should declare it, so that where any reasonable doubt exists as to its constitutionality it should be upheld. (*People* v. *Van Gaskin,* 5 Mont. 352; *People* v. *San Francisco, etc. Ry. Co.,* 35 Cal. 606; *Myers* v. *English,* 9 Cal. 341; *Ex parte Newman,* 9 Cal. 502; *Hobart* v. *Butte County,* 17 Cal. 23.) "Under the established rule of strict construction applicable to state constitutions, an act of the legislature should never be declared unconstitutional unless there is a clear repugnance between the statute and the organic law." (*S. P. Ry. Co.* v. *Orton,* 32 Fed. 457.) In the case

last above cited the court said: "If it is *possible,* therefore, that the city of Stockton may have a public interest in this railroad, then the legislative action is conclusive here that the city does in fact have such an interest." (p. 172.) In the case of *Booth* v. *Town of Woodbury,* 32 Conn. R. 128, the following language is used by the court: "If there be the *least possibility* that making the gift will be promotive *in any degree* of the public welfare, it becomes a question of policy ＊ ＊ ＊ and the determination of the legislature is conclusive." "The judiciary always look at acts of the legislature with great respect, and reconcile and sustain them if possible. ＊ ＊ ＊ The presumption that such a body has sanctioned enactments in violation of the constitution is not to be lightly indulged." (*Stockton, etc, Ry. Co.* v. *City of Stockton,* 41 Cal. 160.)

4. "The settled rule of the construction of state constitutions is that they are not special grants of powers to legislative bodies, but general grants of all legislative powers not actually prohibited or expressly excepted. It is equally well settled that the exception must be strictly construed. The construction is strict against those who stand on the exception and liberal in favor of the government itself." (*S. P. Ry. Co.* v. *Orton,* 32 Fed. 457.) In the case of the states the exercise of all the usually recognized powers of the legislature is valid unless actually prohibited or expressly excepted. (*Smith* v. *Twelfth Dist. Judge,* 17 Cal. 547; *State* v. *Rogers,* 13 Cal. 160; *People* v. *Coleman,* 4 Cal. 46, 60 Am. Dec. 581.) "The federal constitution confers powers expressly enumerated, that of the state contains a general grant of all powers not excepted. The construction of the former instrument is strict against those who claim under it; the interpretation of the latter is strict against those who stand upon the exceptions, and liberal in favor of the government itself." (*Sharpless* v. *Mayor of Philadelphia,* 21 Pa. St. 160.) "Where no constitutional restriction exists, the corporate existence and powers of counties, cities and towns are subject to legislative control." (Dillon, Mun. Corp. Sec. 186.) The legislature has the power to abolish a county organi-

zation. (Dillon, Mun. Corp. Secs. 46, 65; *State .v. Hamilton,* 40 Kan. 323; *People* v. *Hill,* 7 Cal. 97; Cooley, Const. Lim. 228-9; *Patterson* v. *Yuba Co.,* 13 Cal. 333.) The Constitution of the State of Montana expressly authorizes the creation of new counties, and the only limitation placed upon such power of the legislature is that the new county shall pay its ratable proportion of existing indebtedness. (Art. XVI, Sec. 3, Const.) "In the interpretation of a power all the ordinary means to execute it are to be deemed a part of the power itself." (Story's Const. Sec. 430.) "Wherever a general power to do a thing is given, every particular power necessary for doing it is included." (*Id.* Sec. 434.)

Webster's International Dictionary gives nine definitions of the word "place," of which the only pertinent one is the third, which reads as follows: "A position which is occupied and held; a dwelling, a mansion; a village, town or city; a fortified town or post; a stronghold; a region or country." It will be noted that this definition is in fact a number of different definitions, grouped together because of similarity.

The definitions given in the Standard and Century are very similar; the Standard giving 13 definitions and the Century 23. In none of these definitions does the word county occur, nor is there anything which justifies the application of the word to a county except under some such general and indefinite term as a locality or region, or a particular space marked by boundaries.

The law dictionaries, Bouvier's, Anderson's and Black's, give the definition of place as follows: "The word place is a very indefinite term. It is applied to any locality limited by boundaries, however large or however small; it may be used to designate a country, state, county, town or a very small portion of a town. The extent of the locality designated by it must generally be determined by the connection in which it is used." This definition is taken verbatim from the opinion of the court in *Law* v. *Fairfield,* 46 Vermont 432, which was decided in 1874. The question involved in the case was the interpretation and con-

struction of the word "place" occurring in a statute requiring notice in writing to be given "stating the time when and the place where such injury was received," upon a public highway.

There is also a reference in Anderson's definition to the case of *Clapp* v. *Burlington,* 42 Vt. 579, in which the court construed the word "place" occurring in a federal statute to apply to the state generally, and not to any particular part of the state. The phrase under consideration was as follows: "At the place where such bank is located."

In the *Matter of Maguire,* 57 Cal. 604, the court was called upon to construe the word "disqualify" as used in the constitution, and as affecting the constitutionality of a statute. It is significant that the court in that case quoted the definitions of the word as given by Webster and Worcester, and does not appear to have taken any other definition into consideration.

If a broad meaning is to be given to the word "places" it must take in all municipal corporations in the state,—townships, school districts, road districts, towns and cities, as well as judicial representative and senatorial districts. If this be true, then the legislature plainly violates the constitution every time it creates a new county, by giving it a new name; for thereby the name of every school district and every road district in the new county is changed. Section 1750, Political Code, provides that each school district "shall be known as District No.......of .......... County." The name of the county being an integral part of the name of the district, a change of the county's name by *special act,* being in effect a change of the name of the school districts, is prohibited, provided that the word "places" includes a school district. The same is true of road districts organized under the new road law.

In fact, to pursue the illustration further, the creation of a new county is in effect a change in the name of the county, since that part of the county which was formerly known as Deer Lodge is now known as Powell; for the same reasoning which would make the term "place" apply to a county, would make it apply to all parts of it. To paraphrase the definition

given in the law dictionaries, "it may be used to designate a county, or a very small portion of a county."

While the construction and interpretation of the word "persons" as used in the clause under consideration is not directly involved here, it is proper to be considered, and may be of importance, as it is used in connection with the word "places," and may throw some light upon the interpretation to be placed upon the latter.

The word "person" in its broad and comprehensive significance includes both natural and artificial persons, and the courts of New York have always held that where the word "person" occurs in the statutes it includes corporations. (*Field* v. *N. Y. Central Ry.,* 29 Barb. 176.)

Notwithstanding such construction of the word where it occurs in the statutes, the courts of New York have held that "the constitutional limitation upon the legislature to change the name of persons has no application to corporations." (*Moran* v. *Lyndecker,* 27 Hun. 585.)

It must be conceded, therefore, that the word "persons," as used in the section under consideration, is used in its narrow and restricted sense, and includes only natural persons. By analogy, and following the rule laid down that reference may be had to the context in ascertaining the meaning or sense in which a word is used, must it not follow that the word "places" is used in the same narrow and restricted sense? Is it reasonable to say that while the word "persons" is used in its *restricted* sense, the word "places" is used in its *broad* sense, when both are used in the same connection? "The extent of the locality designated by it must generally be determined by the *connection* in which it is used."

And further, if the word "persons" is intended to apply to natural persons only, why may it not be argued that the word "places" refers to natural places, such as lakes, rivers, creeks, canyous, valleys, mountains, etc. Their names are given to them by the people in the first instance, and not by the legislature or the constitution; and it is right and proper that the

people should prohibit the legislature from changing them by special act.

But in the case of a county, its name, if it is newly created, is given to it by the legislature in the first instance, and there is no reasonable argument that can be advanced why the legislature should not be permitted to change by special act that which it created by special act. There is no argument which could be advanced against the advisability of entrusting to the legislature the changing of the name of the county, which could not with equal force be applied to the power of the legislature to name a county in the first instance.

The section in question being an exception to the general power of the legislature to pass special laws upon every subject, it must be strictly construed as against the relatrix in this case, who relies and stands upon the exception, and liberally construed in favor of the constitutionality of the act.

There being an express power given to the legislature to create new counties, the naming and changing of the names of such counties is an incident of the power to create, and therefore the power to change the name is included within the power to create.

It will not be denied that if the change of names in the two counties had been incorporated in the original bill dividing Deer Lodge county, it would be constitutional. And it is within the power of the legislature to repeal Senate Bill No. 3, by which Deer Lodge county was divided and Powell county created. This would leave Deer Lodge county as it was before the passage of Senate Bill No. 3, and the legislature could then pass a law dividing Deer Lodge county, naming one portion of it Daly county, thereby accomplishing by circumlocution that which it is contended is expressly prohibited by the section under consideration.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the Court.

By the first section of an Act of the Seventh Legislative

Assembly, passed on March 7, and approved by the governor on March 8, 1901, it is declared "that county of the state of Montana now named and known as Deer Lodge county shall no longer be Deer Lodge county, but shall hereafter be the county of . Daly, and shall be named, designated and known as and shall constitute Daly county. The boundaries of said Daly county shall be the same as the boundaries of Deer Lodge county now, are, and the city of Anaconda shall be the county seat of said Daly county until changed according to law." The following five sections of the Act contain provisions designed to continue the administration of county affairs without change, except in the name, and to preserve and protect the outstanding obligations of Deer Lodge county. By express provision in the seventh section thereof, the Act became operative at once.

On February 8, 1901, there was duly docketed in the office of the defendant, the clerk of the district court of the Third judicial district, at Anaconda, a deficiency judgment in favor of the relatrix for the sum of $1,119.68, and against Mary and Joseph MacCaffery, this amount remaining unpaid after sale by the sheriff of certain real estate under a decree of foreclosure made and entered by said court in favor of relatrix, and against said Mary and Joseph MacCaffery, on January 7, 1900. This judgment being then unsatisfied, the relatrix, on March 23, 1901, applied to the defendant for execution thereon, but at the same time demanded that he issue the execution under the seal of the court theretofore used, under the provisions of law requiring a seal and prescribing its form, with the words "Deer Lodge County" inscribed thereon instead of the words "Daly County;" claiming that the said Act of the legislative assembly is invalid and ineffectual to change the name of the county from "Deer Lodge" to "Daly," and to authorize the corresponding change in the inscription upon the seal. The defendant agreed to issue the writ as demanded, but under the seal of the court for "Daly" instead of "Deer Lodge" county, and refused to authenticate it as relatrix de-

manded. The relatrix alleges that the defendants mentioned in said judgment are personally liable thereon, and that they own real estate situated in the city of Anaconda of great value, upon which her judgment is a lien. Upon an affidavit filed in this Court on March 27, setting forth the foregoing facts and in addition thereto a sufficient reason why this Court should entertain jurisdiction in the first instance, an order was made directing notice to be given to the defendant to appear and show cause on April 1 why an alternative writ should not issue. The attorney general, appearing for the defendant, resisted the application, on the ground that the affidavit does not state facts sufficient to warrant the relief demanded. Thereupon, by agreement, the parties submitted to the Court the question whether the peremptory writ shall issue.

The position of counsel for relatrix is that the act changing the name of Deer Lodge county is void, because it is obnoxious to Section 26 of Article V of the State Constitution, which provides: "The legislative assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * Changing the names of persons or places. * * * In all other cases where a general law can be made applicable, no special law shall be enacted." Section 150 of the Code of Civil Procedure provides that the district court must have a seal, and Section 152 of the same Code prescribes its form and the words to be inscribed upon it, including, among others, the name of the proper county. Section 1210 of that Code permits the party in whose favor a judgment is given to have, upon demand, at any time within six years after entry thereof, a writ of execution for its enforcement. Section 1211 provides: "The writ of execution must be issued in the name of the state of Montana, sealed with the seal of the court, and subscribed by the clerk," etc. If, therefore, the position of counsel is correct, the writ must issue; for if it was not within the power of the legislature, by a special law, to change the name of the county of Deer Lodge, the act in question is void, and does not justify the defendant in refusing to comply with

the demand of relatrix, and his refusal leaves her without any plain, speedy and adequate remedy in the ordinary course of law; for it is manifest that she is entitled to have such a writ as the law authorizes, to the end that the proceedings thereunder may not be open to question, or that she be put in peril of defeat at any stage thereof.

The questions presented and argued at the hearing are (1) whether the word "places," used in the constitution, includes counties, thus bringing the law within the express prohibition against "changing the names of persons and places;" and (2) whether it is obnoxious to the general provision forbidding a special law in any case where a general law can be made applicable. The provision prohibiting special or local laws is found in the constitutions of many of the states in the Union, some of them nearly identical with that in our own, but, so far as we are aware, no court of final resort in any state has considered and defined the term "places" as used in the phrase in question. The word "place," in popular usage, is a very indefinite term. It is used of an area or portion of land marked off by boundaries, real or imaginary, as a region, locality, site, spot; it is applied to a city, town or village; it is used of a building with adjoining grounds, or of a building or part of a building set apart for a particular purpose, as a theater or church; it includes a fortress or fortified post; it designates a room to abide in, or a seat in such a room, or in a coach or public place; and it is often used of a mere point, as, for instance, "the place of beginning," upon a boundary line, or the point where two lines meet. In legal parlance, it is equally indefinite. Anderson defines it thus: "Any locality limited by boundaries, however large or small, as a country, a state, a county, a town, or a portion thereof. The extent of the locality is to be determined by the connection in which the word is used." This definition is taken substantially from *Law* v. *Fairfield,* 46 Vt. 425, where the word, as used in a statute requiring notice to be given to a town of the time and place where an injury was received upon a highway,

was held to mean the particular point on the highway; the mere mention of a certain highway several miles in length not being sufficiently definite. In the same state, in construing the word as used in the Act of Congress of June 3, 1864, creating the national banking system and permitting shares in a national bank to be taxed "at the place where such bank is located," the term was held to mean the city or town where the owner resided. (*Clapp* v. *Burlington,* 42 Vt. 579, 1 Am. Repts. 355.) So the New Jersey Supreme Court, in construing the same statute, held the word "place" to mean the municipal district which, having the power, imposes the tax. (*State* v. *Hart,* 31 N. J. Law, 434.) Bouvier gives substantially the same definition as Mr. Anderson, citing *Law* v. *Fairfield,* *supra.* In the phrase "law of the place of the contract," the word "place" is used of a state or country. So, also, in the expression "place of trial," used in the Code of Civil Procedure and the Penal Code (Code of Civil Procedure, Secs. 615-619; Penal Code, Sec. 1970), the word primarily means county, and not the immediate place where the trial court sits. In this connection it is equivalent to neighborhood or place of a crime, or a cause of action, or the political division within which a jury must be gathered for the trial, and is synonymous with the word "venue." In other parts of the constitution itself it is used some 18 times, with a great variety of applications. It is applied to a point in a boundary line, a cemetery, a church, a building where an election is held, a military reservation, a dwelling, a court of justice, the capital of the state, to cities, towns, villages, and railroad stations, an institution of learning, and in one instance to the whole state or congressional district. These enumerated instances sufficiently illustrate the indefinite meaning and varied application of the term, both in popular and legal usage. This indefinite meaning likewise demonstrates that the proper signification of the term as used in the constitution must be deduced from the context in which it is found, and the purpose had in view in putting into the organic law of the state an express prohibition of any special legislation with

reference to the name by which a particular one of the class designated by it shall be known. If the mere matter of the name of a place was of so much import in the estimation of the framers of the constitution that they deemed it necessary to insert the prohibition therein, then that prohibition was evidently designed to forestall any evil which might befall at the hands of the legislature through hasty, inconsiderate or precipitate action. In our effort to discover a purpose, thus indicated but not clearly defined, we may refer to the other matters coming within the same prohibition. As to the matter of divorces, the express prohibition was clearly designed to take the power of granting them in particular instances from the lawmaking branch of the government, and to vest it in the judicial department, under uniform laws, to be administered equally for all applicants showing themselves entitled to relief, and thus destroy the possibility of scandal and injustice, often wrought through the medium of personal influence and favoritism. So, also, in prohibiting special and local laws with reference to roads and highways, the locating or changing of county seats, and the regulating of county and township affairs, there is clearly evinced a purpose that all these matters should be left to the people of the particular locality, to be managed, at their discretion, under general laws applicable to all parts of the state. Again, with reference to courts of justice, the rules of evidence in particular cases or inquiries and changes of venue, one object sought was to obtain independence of action and uniformity of administration of the law by the courts provided for by the constitution or established under general laws, so that "right and justice should be administered without sale, denial or delay." (Constitution, Art. III, Sec. 6.) And so, continuing through the list, we find that in each particular enumerated the prohibition is founded upon a substantial, not a sentimental, reason, and that in each case it makes for the administration of justice under equal laws.

Turning, now, to discover the purpose of the prohibition in question, we may at once assume that the principal connection

in which names of places were deemed of sufficient importance to become a matter of legislative cognizance was with reference to the political divisions and municipalities of the state; for it cannot be admitted for a moment that the framers of the constitution, while considering matters of so much import as those to which we have just adverted, bethought themselves that it would be wise, for sentimental reasons, to prohibit the enactment of special laws changing the names of mountains, valleys and similar well known objects upon the face of nature, and omitted consideration of these governmental agencies altogether. Evidently one purpose, at least, sought to be accomplished, was to preserve to the people of a particular locality the right to retain a name chosen by themeselves, or one for which an attachment had been formed by long association, and at the same time to serve a governmental purpose by avoiding the confusion which might arise from a frequent change of the names of the political subdivisions and municipalities of the state. Frequent change destroys local attachments, and the want of this feeling tends strongly to weaken those sentiments of local pride which contribute so much to the upbuilding of a particular community. Again, it leads to confusion in the administration of local affairs, and adds materially to the expense and labor on the part of the people and those who serve the public—necessary to preserve the identity and continuity of local authority. On a change of names of an incorporated city or town, for instance, there would necessarily be a corresponding change in its records, a substitution of one name for another in all of its obligations and contracts, and a change in the designation of its officers and courts, all of which would lead to confusion and considerable expense. So, also, in the change of a name of a county, like changes would be necessary in the particulars just mentioned with reference to cities and towns, and, furthermore, uncertainty and confusion would arise as to the propere record of titles to lands and the obligations of the municipality, all of which would impose labor and expense. True, the incorporated city or town pos-

sesses very different powers, and is under different liabilities, from those of a county; but in the important respect that they are both intrusted under the constitution with the exclusive power of taxation for local purposes, and the management of local affairs without interference by the legislature, they occupy relatively the same positions as governmental agencies. One is a voluntary organization by permission of the legislature, and the other is, or may be, the creature of the legislature; nevertheless, each, in the management of its local affairs, is, ordinarily, free and independent, except so far as it may be controlled by general laws operating upon all alike. The term "places," as used in the constitution, unless it was intended to be applied only to objects upon the face of nature, must be applied to both of them alike; for we can discover no reason why it should include the former and exclude the latter. True, the constitution recognizes the power of the legislature to create new counties, to change those already established, and to alter their boundaries (Constitution, Art. VI, Sec. 4; *Id.* Art. XVI, Secs 1, 3), and this power has been heretofore exercised in many instances. It has been recognized and affirmed by this Court, as in *Holliday* v. *Sweet Grass County,* 19 Mont. 364, 48 Pac. 553, where a special Act creating the defendant county was upheld; and this power to create necessarily implies the power to destroy, so that, in the exercise of it, the legislature may abolish a county organization, and incorporate its territory within another county. It may also at the same time exercise any other power incidental to a complete exercise of the principal one; but this power does not necessarily carry with it the right to interfere by special enactment in the internal affairs of the county, even though a majority of the people do not object. The whole spirit of the constitution is opposed to this species of interference, and, for the reasons already stated, it seems clear to us that the prohibition in question was designed to prevent just such interference as has been attempted in the present instance. The power to create counties and give them names, or to destroy them, is unquestioned; but after they are

created they may not be disturbed by special or local legislation, except incidentally, in the exercise of the creative power, or in cases where a general law cannot be made applicable.

In reaching this conclusion, we have not overlooked the familiar fundamental principle that the constitution of a state is not grant of legislative power, but a mere limitation upon it, and that the legislature possesses power to legislate upon all matters except in so far as it may be expressly forbidden by the constitution, or where the particular subject has been delegated to the federal government. We have also borne in mind the rule that a statute must be clearly and manifestly in contravention of the constitution, or the court will not declare it so. It is only by an application of these principles to the situation here presented that we have adopted the views stated.

We are strengthened in our conviction by the fact that the word "person," used in the phrase under consideration in the constitution of the state, is properly construed to embrace all persons, whether natural or artificial. This view is taken by the Supreme Court of California in *In re La Societe Francaise d'Epargnes et de Prevoyance Mutuelle,* 123 Cal. 525, 56 Pac. 458, where it is held that the word applies to a banking corporation. So, also, the Supreme Court of the United States has declared that this term, as used in the fourteenth amendment to the Constitution of the United States, includes railroad corporations as well as natural persons. (*Santa Clara County* v. *Southern Pac. R. Co.,* 118 U. S. 394, 6 Sup. Ct. 1132, 30 L. Ed. 118.) Reasoning by analogy, it is fair to conclude that the word "places" is here used in its less restricted meaning, and applies to counties, with their subdivisions, as well as to incorporated cities and towns; thus including all classes of municipalities, while not excluding, perhaps, well known natural objects.

The result reached precludes the necessity of considering the second question urged.

It is ordered that judgment be entered that the peremptory writ issue as prayed, and that the relatrix recover the costs of this application.

*Writ granted.*